## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,              )
                               )
              **Plaintiff,**       )     **Criminal Case No. 07 Cr 2915 JM**
                               )
       v.                     )
                               )
QING LI,                   )     **NOTICE OF MOTION**
                               )
              **Defendant.**    )

**PLEASE TAKE NOTICE** that upon the memorandum of law, that the defendant, Qing

Li, will move the United States District Court for the Southern District of California, before the

Hon. Jeffrey T. Miller for the following Orders:

1.     Dismissing the Indictment for Legal Insufficiency

2.     Suppressing Evidence seized as the result of Illegal government conduct.

3.     Suppressing Evidence which is the fruit of the poisonous tree and,

for such other and further relief that this Court may deem just an proper.

Dated: New York, New York
       January 14, 2008

                                  Goldberger & Dubin PC

               By:     _Stacey Van Malch_
                                  Stacey Van Malden, Esq.
                                  Attorneys for Defendant Li
                                  401 Broadway Ste 306
                                  New York, NY 10013
                                  212-431-9380

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Case No. 07 Cr 2915 JM |
| Plaintiff, | ) | |
| | ) | Memorandum of Law in |
| v. | ) | Support of Motions |
| | ) | |
| QING LI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant Qing Li respectfully submits the following Memorandum of Law in Support of

her Motion and says:

Defendant is charged in a one count indictment with conspiracy to violate the Arms

Export Control Act (18 U.S.C. §371/2778). This indictment must be dismissed or the evidence

the government seeks to use against her must be suppressed.


## I.  Motion to Dismiss the Indictment when it is Insufficient as a Matter of Law.

The defendant herein is charged with conspiracy to violate the arms export control act (22

USC §2778), in violation of 18 USC 371.

For the Indictment to be sufficient, the  Government must prove Ms. Li entered into an

agreement to willfully violate 22 USC 2778,   including knowledge that a Piezoresistive

Accelerometer Model 7270-200K was on the export control list.  Because  22 USC §2778 is

unconstitutionally vague as applied to Ms. Li the Indictment must be dismissed.

"A criminal statute is not vague if a reasonable person of ordinary intelligence would

understand what conduct the statute prohibits.  A regulation is not unconstitutionally vague if

that regulation is capable of a limited interpretation such that"(1) ordinary people could

understand what conduct is prohibited, and (2) those enforcing the law are provided with clear standards to constrain them." United States v. Lee, 183 F.3d 1029, 187 F.3d 650 (9th Cir. 1999). (internal citations omitted).

22 USC §2778 makes unlawful the export of certain defense articles without a license. The items which are controlled are chosen by the President, and are codified at 22 CFR 121.1. When the Department of Justice needs to determine if a certain product is export controlled, they must make a request of the Directorate of Defense Trade Controls. This directorate within the Department of State is tasked with maintaining the list of prohibited items, and is able to inform Justice if certain products are on the prohibited list.

A person of ordinary intelligence could not possibly determine that a Piezoresistive Accelerometer Model 7270-200K was an item which needed an export license.

A word search of 22 CFR 121.1 reveals that the words, Piezoresistive Accelerometer Model 7270-200K are not found. The words sensor and accelerometer are found only in "Category XII" which prohibits from export without a license:

"(d) Inertial platforms and sensors for weapons or weapon systems; guidance, control and stabilization systems except for those systems covered in Category VIII; astro-compasses and star trackers and military accelerometers and gyros. .."

Appended hereto, and made part of as Exhibit "A", is public information available from Endevco, the manufacturer of the Piezoresistive Accelerometer Model 7270-200K. This data sheet states that this item is some type of sensor, but does not indicate it is for military or weapons use. A person of ordinary intelligence would likely deem that data sheet incomprehensible.

Reading the data sheet and 22 CFR 121.1 would not warn a person of ordinary intelligence that export of a Piezoresistive Accelerometer Model 7270-200K required a license. Only individuals who are in businesses which deal with the items on a daily basis and a special directorate in the State Department know what items need a license for export.   In fact, even prosecutors cannot be sure that a certain piece of equipment is on the list until they receive confirmation from the State Department.

In the cases in which Courts in this Circuit have found 22 USC 2778 not vague as applied, the defendants each possessed specialized knowledge regarding the products they sought to export. In United States v. Hoffman, 10 F.3d 808 (9th Cir. 1993), the defendant was a rocket scientist convicted for his attempted export of a software program he developed while working for the Government.  In United States v. Posey, 864 F.2d 1487 (9th Cir. 1989) the defendant was in the business of selling technical data for military aircraft.  In United States v. Helmy, 951 F.2d 988 (9th Cir. 1992) one defendant worked for Teledyne, McCormick, Selph  as the chief scientist on a gun project, and the other was the company's midwest marketing representative.

The Government can present no evidence that this defendant, Qing Li, had any knowledge that a Piezoresistive Accelerometer Model 7270-200K was a prohibited article.

The regulations themselves are not meant to deter suburban housewives or even suburban housewives with MBA's from exporting defense articles:

> "The regulation at issue is directed to a relatively small group of sophisticated international businessmen." Given that context, it is clear that the regulation sufficiently communicates its meaning. See United States v. Swarovski, 592 F.2d 131, 133 (2d Cir. 1979) (rejecting a defendant's vagueness challenge to the predecessor statute to 22 U.S.C.S 2778 in part because "[w]e are dealing here with a regulation of limited scope aimed at a small and relatively sophisticated group of persons."). In the sensitive business of exporting military items, the statute and its implementing regulation more than suffice to put exporters on notice to consult the applicable regulations and, if necessary, contact the appropriate government agency to resolve any perceived ambiguity. See Hoffman Estates v. Flip-side, Hoffman Estates, Inc. , 455 U.S. 489, 498 (1982) ("Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to

an administrative process."). <u>United States v. Lee</u>, 183 F.3d 1029, 187 F.3d 650
(9th Cir. 1999).

Without demonstrating that this defendant has some sort of specialized knowledge, this
statute as applied to her is Unconstitutionally vague.

### II.   Motion to Suppress all Information obtained through the use of "Customs Enforcement Subpoenas"

The main evidence which ties this defendant to the conspiracy alleged is evidence which
tends to show that someone in Stamford, Connecticut signed into the chinaman 999 MSN
Hotmail account on numerous occasions.  The evidence is made up of Internet Protocol (IP)
Addresses which the Government subpoenaed from CSC Holdings and a Public Library in
Stamford, pursuant to a "customs enforcement subpoena."

The IP Addresses are information which the government may obtain from an electronic
communications provider pursuant to 18 USC §2703(c), provided the government gets a court
order, search warrant, consent from the consumer, a grand jury or trial subpoena,  or uses an
"administrative subpoena authorized by a Federal or State statute..."  This statute is part of the
Stored Communications Act.  18 USC §§2702-2712.  The United States Code is devoid of any
statute which permits ICE or DHS the power to issue an administrative subpoena for this type of
information in a criminal case.[1]

There are certain Federal Statutes which allow for the issuance of administrative
subpoenas in criminal cases.  The Stored Communications Act at 18 USC 2709 allows the
Federal Bureau of Investigation to issue "National Security Letters" to telecommunications
companies for information otherwise confidential pursuant to the act.  Administrative Subpoenas
are also available under statute for information relating to child pornography and for
investigations undertaken by the Secret Service. 18 USC §2256.  50 USC Appendix §2411 gives

---

[1] It should be noted that in responding to the Subpoena, Cablevision stated it was only giving the
information in accordance with the Patriot Act.   The Patriot Act does not authorize such
disclosure.

authority to Customs to issue administrative subpoenas to investigate violations of the Export

Acts set forth in that title. Thus, the only Federal or State Statute which could possibly give

Customs authority to issue subpoenas is 22 USC §2278(e). This section gives the President

authority to investigate violations of 22 USC §2278.

### e) Enforcement powers of President

In carrying out functions under this section with respect to the export of defense
articles and defense services, the President is authorized to exercise the same powers
concerning violations and enforcement which are conferred upon departments,
agencies and officials by subsections (c), (d), (e), and (g) of section 11 of the Export
Administration Act of 1979 (50 App. U.S.C. 2410( c ), (d), (e), and (g)), and by
subsections (a) and (c) of section 12 of such Act (50 App. U.S.C. 2411(a) and ( c )),
subject to the same terms and conditions as are applicable to such powers under such
Act (50 App. U.S.C. 2401 et seq.). Nothing in this subsection shall be construed as
authorizing the withholding of information from the Congress. Notwithstanding
section 11(c) of the Export Administration Act of 1979, the civil penalty for each
violation involving controls imposed on the export of defense articles and defense
services under this section may not exceed $500,000.

The President has delegated this authority to the Department of State. Notes to 22 USC

§2778.[2] The Department of State has given the following authority to Customs in the

International Traffic in Arms Regulations (ITAR):

---

[2] **Delegation of Functions**

Functions of President under this section, with certain exceptions, delegated to Secretary of State,
with concurrence of Secretary of Defense required for designations of items or categories of
items which are considered as defense articles or services subject to export control under this
section, by section 1(l)(1) of Ex. Ord. No. 11958, Jan. 18, 1977, 42 F.R. 4311, as amended, set
out as a note under section 2751 of this title.
Functions of President under this section relating to the control of import of defense articles and
services transferred to Attorney General, with certain requirements for considering the views of
Secretary of State and for receiving concurrence of Secretary of State and Secretary of Defense
for designations of items or categories of items which are considered as defense articles and
services subject to import control under this section, by section 1(l)(2) of Ex. Ord. No. 11958.
Functions of President which involve subsec. (e) of this section and are agreed to by Secretary of
State and Secretary of Commerce delegated to Secretary of Commerce to be carried out on behalf
of Secretary of State by section 1(l)(3) of Ex. Ord. No. 11958.

**§ 127.4 Authority of U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection officers.**

(a)    U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection officers may take appropriate action to ensure observance of this subchapter as to the export or the attempted export of any defense article or technical data, including the inspection of loading or unloading of any vessel, vehicle, or aircraft. This applies whether the export is authorized by license or by written approval issued under this subchapter.

(b)    U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection officers have the authority to investigate, detain or seize any export or attempted export of defense articles or technical data contrary to this subchapter.

(c)    Upon the presentation to a U.S. Customs and Border Protection Officer of a license or written approval authorizing the export of any defense article, the customs officer may require the production of other relevant documents and information relating to the proposed export. This includes an invoice, order, packing list, shipping document, correspondence, instructions, and the documents otherwise required by the U.S. Customs and Border Protection or U.S. Immigration and Customs Enforcement.

When there is no statutory authority for the issuance of a Customs Enforcement Subpoena to gather evidence in this criminal investigation, then all evidence gathered thereunder and their fruits must be suppressed.

The Government may argue that IP addresses are not Constitutionally protected, and therefore this technical violation of Statute should not lead to exclusion of the information and its fruits. However, this is no mere "technical" violation. The Stored Communications Act demonstrates Congress's intent to grant privacy protection to such information:

The Stored Communications Act protects individuals' privacy and proprietary interests. The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility. Just as trespass protects those who rent space from a commercial storage facility to hold sensitive documents, cf. Prosser and Keeton on the Law of Torts § 13, at 78 (W. Page Keeton ed., 5th ed. 1984), the Act protects users whose electronic communications are in electronic storage with an

ISP or other electronic communications facility. <u>Theofel v. Farey-Jones</u>, 359 F.3d 1066 (9th Cir. 2004)

Ms. Li has a reasonable expectation in the privacy of these communications, therefore the Government's illegal seizure of the IP addresses she accessed must lead to their suppression.

### III. The search warrants and electronic interceptions must be suppressed

Ms. Li would submit that all evidence collected through the use of a pen register/trap and race, search warrant or an Order for electronic interception must be suppressed when the information creating probable cause for their issuance, the IP addresses, were illegally seized as set forth <u>supra</u>. Simply put, the information collected through the use of "customs enforcement subpoenas" is the lynchpin in the Government's case against Ms. Li.[3]  The information disclosed through the use of those subpoenas led to each and every search warrant and electronic intercept order. Thus, if the use of such administrative subpoena was unauthorized, all evidence derived therefrom must be suppressed.

WHEREFORE, Ms. Li would respectfully request that the Indictment be dismissed, the evidence gathered against her suppressed, and for such other and further relief that this Court may deem just and proper.

Dated: New York, New York
      January 14, 2008

Goldberger & Dubin PC

By:    *Stacey Van Malden*

Stacey Van Malden, Esq.
Attorneys for Defendant Li
401 Broadway Ste 306
New York, NY 10013
212-431-9380

---

[3] Paragraph 37 (page 14) of the Affidavit in Support of the first Title III application of Michael Cochran says it best, tying Ms. Li into the investigation solely through the subpoenas.

# Piezoresistive Accelerometer

## Model 7270A

- **2000 to 200 000 g Full Scale**
- **High Resonance Frequency**
- **DC Response for Long Duration Transients**
- **No Zeroshift**
- **Pyrotechnique and Penetration**



Actual size

### DESCRIPTION

The ENDEVCO® Model 7270A series of piezoresistive accelerometers are rugged un-damped units designed for shock measurements.

ENDEVCO micro-machines the sensing system of the 7270A from a single piece of silicon. This etched silicon chip includes the inertial mass and strain gages arranged in an active four-arm Wheatstone bridge circuit complete with a novel on-chip zero balance network.

The low mass, extremely small size and unique construction of the element blends an exceptionally high resonance frequency with characteristics such as low impedance, high overrange, and zero damping for no phase shift. The high resonance frequency of these sensors permits their survival in the presence of these high frequency components in a shock pulse that could shatter the seismic system of accelerometers having lower resonance.

High resonance frequencies and zero damping also allow the accelerometers to respond accurately to fast rise time, short duration shock motion. With a frequency response extending down to dc or steady state accelerations, these transducers are ideal for measurement of long duration transients.



Model 7270A–XXM4, with integral 1/4–28 mounting stud, is available on special order.

ENDEVCO Model 136 Three-Channel System, Model 4430A or OASIS 2000 Computer-Controlled System are recommended as signal conditioner and power supply.

## SPECIFICATIONS

**PERFORMANCE CHARACTERISTICS:** All values are typical at +75°F (+24°C), 100 Hz and 10 Vdc excitation unless otherwise specified. Calibration data, traceable to the National Institute of Standards (NIST), is supplied.

| | Units | 7270A-2K | -6K | -20K | -60K | -200K |
|---|---|---|---|---|---|---|
| RANGE [1] | g pk | ±2000 | ±6000 | 20 000 | ±60 000 | ±200 000 |
| SENSITIVITY | µV/g | 100 ±50 | 30 +20/-15 | 10 ±5 | 3 +2/-1.5 | 1 ±0.5 |
| AMPLITUDE RESPONSE [2] | | | | | | |
| ±5% | kHz | 0 to 10 | 0 to 20 | 0 to 50 | 0 to 100 | 0 to 150 |
| ±1dB | kHz | 0 to 14 | 0 to 27 | 0 to 68 | 0 to 136 | 0 to 200 |
| MOUNTED RESONANCE FREQUENCY | kHz Typ | 90 | 180 | 350 | 700 | 1200 |
| | (Min) | (60) | (120) | (220) | (400) | (800) |
| NON-LINEARITY AND HYSTERESIS | % Max | ±2, up to acceleration corresponding to the recommended range. | | | | |
| (% of reading, to full range) | | Measurement uncertainties prevent stating this as a specification limit above 10 000 g. | | | | |
| TRANSVERSE SENSITIVITY | % Max | 5 | 5 | 5 | 5 | 5 |
| ZERO MEASURAND OUTPUT | mV Max | ±100 | ±100 | ±100 | ±100 | ±100 |








**ENDEVCO**
**MODEL**
**7270A**

# Piezoresistive Accelerometer

## SPECIFICATIONS—continued
### PERFORMANCE CHARACTERISTICS

| | Units | 7270A | -6K | -20K | -60K | -200K |
|---|---|---|---|---|---|---|
| ZERO SHIFT DUE TO HALF SINE ACCELERATION CAUSING 200 mV OUTPUT (or 150 000 g, whichever is smaller) | mV Max | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| ZERO SHIFT DUE TO MOUNTING TORQUE (0 TO 8 LBF-IN., 0 TO 0.9 Nm) | mV Max | ±2 | ±2 | ±2 | ±2 | ±2 |
| THERMAL ZERO SHIFT [4] From -30°F to +150°F (-34°C to +66°C) | mV Max | ±50 | ±50 | ±50 | ±50 | ±50 |
| THERMAL SENSITIVITY SHIFT From 0°F to +150°F (-18°C and +66°C) | % Max | ±10 | ±10 | ±10 | ±10 | ±10 |
| OVERRANGE LIMIT [2] | g pk | ±10 000 | ±18 000 | ±60 000 | ±180 000 | ±200 000 |
| WARM-UP TIME | Minutes Max | 2 | 2 | 2 | 2 | 2 |
| | (Seconds) Typ) | (15) | (15) | (15) | (15) | (15) |

### ELECTRICAL
| | |
|---|---|
| EXCITATION | 10.0 Vdc, 12 Vdc maximum |
| INPUT RESISTANCE | 650 ±300 ohms |
| OUTPUT RESISTANCE | 650 ±300 ohms |
| INSULATION RESISTANCE | 100 megohms minimum at 100 Vdc; between sensor, cable shield and case |

### PHYSICAL
| | |
|---|---|
| CASE, MATERIAL | Stainless Steel (17-4 PH CRES) |
| ELECTRICAL, CONNECTIONS | Integral cable, 4 conductor No. 36 AWG Teflon® insulated leads, braided shield, flourocarbon jacket |
| IDENTIFICATION | Manufacturer's logo, model number and serial number |
| MOUNTING/TORQUE [3] | Holes for two 4-40 or M3 mounting screws, 8 ±2 lbf-in (0.9 Nm) |
| WEIGHT | 1.5 grams (cable weighs 3.6 grams/meter) |

### ENVIRONMENTAL
| | |
|---|---|
| ACCELERATION LIMITS [3] [4] | ±200 000 g half sine pulse or three times the recommended range, in any direction, whichever is smaller. Pulse duration should be the greater of 20 microseconds or five periods of the resonance frequency |
| BASE STRAIN SENSITIVITY (at 250 microstrain) | Typically less than 0.5 mV |
| TEMPERATURE Operating | -30°F to +150°F (-34°C to +66°C) |
| Storage | -65°F to +250°F (-54°C to +121°C) |
| HUMIDITY | Unaffected. Unit is epoxy sealed |
| ALTITUDE | Unaffected |

### CALIBRATION DATA SUPPLIED
| | |
|---|---|
| SENSITIVITY [5] | µV/g at recommended range or 5000 g, whichever is smaller. Time history at respective g level |

### ACCESSORIES
| | |
|---|---|
| EHW265 | (2) SIZE - 4 FLAT WASHERS |
| EH137 | (2) 4-40 X 1/4 INCH ALLENOY STEEL, OR EQUIVALENT, SOCKET HEAD CAP SCREWS |

### OPTIONAL ACCESSORIES
| | |
|---|---|
| 25034 | 4 CONDUCTOR SHIELDED CABLE |
| 7970 | TRIAXIAL MOUNTING BLOCK |
| EHX268 | ACOUSTIC COUPLANT |

### NOTES
1. The unit will operate to the overrange limit, with slightly degraded linearity. Above the overrange limit, the sensor may fail. IMPORTANT: Frequency content of shocks which exceed the 7270A overrange limits often contain amplitudes above 100 kHz. Insufficient bandwidth in signal conditioning may give lower indicated peak acceleration.
2. Frequency response deviates less than ±5% from dc to indicated frequency based on analysis. Measurement uncertainties above 10 kHz prevent stating ±5% as a specification limit for all but the 7270A-2K.
   NOTE: The sensor chip includes two masses, each with a separate resonance frequency. If these resonances are excited, the transducer output will exhibit a "beat" frequency.
3. Use 8 ±2 lbf-in (0.9 Nm) mounting torque, acoustic couplant and high strength steel screws to ensure intimate contact

between accelerometer and mounting surface, to prevent yielding of the screw and loss of preload force due to shocks, particularly those above 100 000 g. Loss of meaningful data and possible damage to the accelerometer can result from using an incorrect value of mounting torque.
The use of low strength mounting material (such as aluminum) is not recommended. However, if such is the case, epoxy should be used between the transducer and mounting surface. If large transverse shocks are anticipated, the use of liquid threadlocking compounds is recommended to reduce loss of screw preload.
4. Prior to final calibration, each accelerometer is given a shock in its sensitive axis approximately equal to its overrange limit (reference ENDEVCO TP283)
5. Calibrations are performed on Model 2985C Shock Calibrator or Model 2925 POP Shock Calibrator.
6. Maintain high levels of precision and accuracy using Endevco's factory calibration services. Call Endevco's inside sales force at 800-982-6732 for recommended intervals, pricing and turn-around time for these services as well as for quotations on our standard products.

NOTE: Tighter specifications available on special order.

Continued product improvement necessitates that Endevco reserve the right to modify these specifications without notice. Endevco maintains a program of constant surveillance over all products to ensure a high level of reliability. This program includes attention to reliability factors during product design, the support of stringent Quality Control requirements, and compulsory corrective action procedures. These measures, together with conservative specifications have made the name Endevco synonymous with reliability.

ENDEVCO CORPORATION, 30700 RANCHO VIEJO ROAD, SAN JUAN CAPISTRANO, CA 92675 USA (800) 982-6732 (949) 493-8181 fax (949) 661-7231
www.endevco.com                                                                                    Email:applications@endevco.com

1100



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**FILED**

AUG 2 9 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES FOR AN ORDER )
AUTHORIZING THE INTERCEPTION OF )
ELECTRONIC COMMUNICATIONS )
_____ )

No. <u>07mc0438</u>

**<u>UNDER SEAL</u>**

### <u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

I, Michael B. Cochran, Special Agent, Immigration and Customs Enforcement, United States Department of Homeland Security, being duly sworn, depose and state:

### I.      TRAINING AND EXPERIENCE

1.      I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the United States Immigration and Customs Enforcement ("ICE"), Department of Homeland Security ("DHS"). I have been so employed since January 2003. Prior to my employment with ICE, I served as a Special Agent with the United States Air Force Office of Special Investigations.

3.      I am a graduate of the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia. At FLETC, I was trained in, among other things, criminal investigative techniques, and export-control investigations. I have participated in and directed criminal investigations involving, among other things, the illegal export of military and defense articles out of the United States. I have received formal training and extensive on-the-job experience and

-1-

1   training in the laws and regulations relating to the Arms Export Control Act, 22 U.S.C. § 2778,

2   and International Traffic in Arms Regulations, 22 CFR 120-130, and I have conducted and

3   participated in investigations of violations of these laws and regulations.

4        4.    My knowledge of the facts alleged in this affidavit arises from my training and

5   experience, my personal observations, my participation in the federal investigation described

6   herein, my conversations with other law enforcement agents involved in this investigation, and

7   my review of records obtained during this investigation. Because this affidavit is submitted for

8   the limited purpose of securing an authorization for the interception of electronic

9   communications, it does not include every fact known to me concerning the investigation.

10  **II.    PURPOSE OF THIS AFFIDAVIT**

11

12       5.    This affidavit is submitted in support of an application for an order authorizing

13  the interception of electronic communications occurring to and from the MSN/Hotmail account

14  chinaman326@hotmail.com (the "TARGET ACCOUNT"), subscribed to by "china, man999",

15  Beijing, China, concerning offenses enumerated in 18 U.S.C. § 2516, that is, attempted export of

16  defense articles in violation of the Arms Export Control Act (22 U.S.C. § 2778 and 22 CFR

17  127.1), conspiracy to violate the Arms Export Control Act (18 U.S.C. § 371), and conspiracy to

18  launder monetary instruments (18 U.S.C. § 1956(a)(2)(A) and (h)) (collectively, the "TARGET

19  OFFENSES").

20

21       6.    Based on the facts set forth herein, I submit there is probable cause to believe: (1)

22  that QING LI, an individual known as "WANG" or FANG XUE (the "TARGET SUBJECTS")

23  and others yet unknown have committed, are committing, and will continue to commit the

24  TARGET OFFENSES; and (2) that the electronic communications of the TARGET SUBJECTS,

25  and others yet unknown, concerning the TARGET OFFENSES will be obtained through the

-2-

1    interception of such communications to and from the TARGET ACCOUNT.

2        7.    I have learned through my investigation and from other law enforcement

3    personnel who are also familiar with the applicable computer and Internet technology that the

4    TARGET ACCOUNT is operated by MSN/Hotmail, a free e-mail service provider that offers its

5    subscribers the opportunity to send and receive e-mail messages over the Internet. The

6    headquarters of MSN/Hotmail are located in Mountain View, California. I understand, based on

7    discussions with Jose Martinez, Criminal Compliance Manager for MSN/Hotmail, that with the

8    requested order of the Court, Hotmail will be able to intercept electronic information concerning

9    the TARGET ACCOUNT, including e-mails sent from or received by the TARGET ACCOUNT,

10    draft e-mail messages, and other information relating to the TARGET ACCOUNT. Hotmail

11

12    receives and stores this information in Mountain View, California.

13        8.    If this Court authorizes the interception, the process ICE and MSN/Hotmail would

14    follow to comply with the Court's order is as follows. MSN/Hotmail would establish an

15    identical account for the TARGET ACCOUNT known as a "shadow account," which would be

16    undetectable by the account holder and that would not interfere with the ordinary operation of

17    the TARGET ACCOUNT. Consistent with the proposed order, whenever an electronic mail

18    message, and any attached file, are sent from or delivered to the TARGET ACCOUNT, or

19    whenever any electronic information or communication is generated by or received into the

20    TARGET ACCOUNT, such as the creation of draft messages, that information or

21    communication will be directed to the Hotmail "shadow account." The information generated by

22    or received into the TARGET ACCOUNT would be gathered and sent to the shadow account at

23    regular intervals (as often as every five minutes). The shadow account will be accessed by ICE

24

25    agents and other federal officers in San Diego, California, where the e-mails and other electronic

-3-

OLJ-WTP-00000050

1 information and communications will first be monitored and reviewed.  Thus, all monitoring of

2 the interceptions over the TARGET ACCOUNT will be performed in San Diego, California, by

3 law enforcement officers authorized under Title 18, United States Code, Section 2510(7),

4 including agents of ICE, DCIS and government employees or individuals (including translators)

5 operating under a contract with the government, who will be acting under the supervision of

6 investigative or law enforcement officers authorized to conduct the interception.  The process for

7 minimization is described in Section IX of this Affidavit.

8 **III.    OBJECTIVES**

9     9.    Based on my training and experience and the facts set forth herein, I submit there

10 is probable cause to believe that the interception of electronic communications, the authorization

11 for which is sought herein, will help to reveal: (i) the nature, extent and methods of operation of

12 the illegal defense article procurement and exporting activities of the TARGET SUBJECTS and

13 others; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and

14 participants in the TARGET OFFENSES; (iii) the attempted acquisition, concealment, export

15 and re-export of defense articles and other commodities and the laundering of monetary

16 instruments; (iv) the dates, times and places when these illegal activities will occur or have

17 occurred; and (v) the existence and location of records pertaining to the aforementioned illegal

18 activities.  In addition, the electronic communications are expected to constitute admissible

19 evidence of the TARGET OFFENSES.

20 **IV.    PRIOR APPLICATIONS**

21     10.    No previous applications are known to have been made to any judge for

22 authorization to intercept electronic communications involving any of the persons, facilities, or

23

24

25

OLJ-WTP-00000051

1  premises named herein.[1]

2  ## V.    BRIEF DESCRIPTION OF THE TARGET SUBJECTS

3  11.    Qing Li. As further detailed below, LI is a Chinese national currently residing in

4  Stamford, Connecticut, and I submit there is probable cause to believe that LI has conspired with

5  WANG and others yet unknown to obtain the illegal export of military-grade accelerometers

6  from the United States to the People's Republic of China.

7  12.    Wang. As further detailed below, WANG is the name used by an individual in

8  China when sending e-mail communications from the TARGET ACCOUNT. As set forth

9  herein, there is probable cause to believe that WANG has used, and will continue to use, the

10  TARGET ACCOUNT to communicate with both LI and an ICE undercover storefront

11  concerning the illegal export of the accelerometers to China.

12

13  ## VI.    THE ARMS EXPORT CONTROL ACT AND RELATED LAWS

14  13.    The Arms Export Control Act ("AECA") regulates the brokering and export of

15  defense articles and services from the United States. Among other things, the AECA authorizes

16  the President of the United States to: (1) designate defense articles and defense services on the

17  United States Munitions List ("USML"); (2) require licenses or other approvals for the brokering

18  or export of defense articles on the USML; and (3) promulgate regulations to implement the

19  AECA. The regulations are known as the International Traffic in Arms Regulations ("ITAR"),

20  Title 22, Code of Federal Regulations, Sections 120-130. The United States Department of

21  State, Directorate of Defense Trade Controls, administers the ITAR and regulates the export of

22  defense articles. It is the policy of the United States to deny licenses and other approvals for

23  exports of defense articles destined for China. 22 CFR 126.1.

24

25
_____

[1]    The checks of EISUR indices of FBI, DEA and ICE were completed on or about August
2, 9 and 15, 2007.

OLJ-WTP-00000052

VII.    **THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS ARE USING, AND WILL CONTINUE TO USE, THE TARGET E-MAIL ACCOUNT TO FURTHER THE TARGET OFFENSES**

14.    Endevco Corporation (ENDEVCO) is located in San Juan Capistrano, California. ENDEVCO manufactures a product identified as a 7270A-200K piezoresistive accelerometer, which is capable of measuring shocks up to and beyond 200,000 $g$-force. I have reviewed an official report from the Department of Defense stating that applications for these accelerometers include, among other things, the development of missiles, large guns, artillery, aircraft and vehicles, and the measurement of ground motions produced by nuclear and chemical explosions. I also have reviewed a certification issued by the United States Department of State, Directorate of Defense Trade Control, confirming that the 7270A-200K accelerometer is a defense article on the United States Munitions List, Category XII(d). Category XII(d) covers "[i]nertial platforms and sensors for weapons or weapon systems; guidance, control and stabilization systems . . . ; astrocompasses and star trackers and military accelerometers and gyros." 22 CFR 121.1, Category XII(d).

15.    In March 2007, Russell Spittler, Director of Government Affairs for ENDEVCO, forwarded to me an e-mail received by an ENDEVCO employee from QING LI at qingli@optonline.net. The e-mail, dated March 19, 2007, stated: "A client of mine in China is in need of sensor: ENDEVCO 7270A-200K. The scale is 20G. Do you have this product and can you provide me with picture?" Mr. Spittler also provided me with ENDEVCO's reply e-mail to qingli@optonline.net, which stated: "Hi Qing, The model 7270A is export controlled by the U.S. government and can not be exported."

16.    At my direction, an ENDEVCO representative sent a second e-mail to qingli@optonline.net, referring LI to an ICE undercover storefront located in San Diego,

-6-

California (the "UC storefront").  Specifically, the e-mail advised LI that "we have a trading company that assisted us in the past with these situations."  The e-mail from ENDEVCO provided LI with the UC storefront's e-mail address.

17.    On April 2, 2007, the UC storefront received an e-mail from qingli@optonline.net.  The e-mail stated: "Hello, I am looking for sensor for my client in China. The model is: ENDEVCO 7270A-200K.  The scale is 20G.  Do you have this product and could you provide me with picture?  I can be reached by phone also at: 203-406-9984; 203-962-2718(cell).  Thanks."[i]

18.    On April 2, 2007, the UC storefront responded with an e-mail to qingli@optonline.net, stating that the UC storefront had a number of 7270A-200K accelerometers available.  The e-mail stated, in part: "How many of these items do you require? As you know, these items are export controlled so you will need to keep this in mind if you are serious about proceeding with this purchase."  The e-mail included an attachment of three photographs of the 7270A-200K accelerometers.

19.    On April 2, 2007, LI e-mailed the UC storefront and advised the first order would be for around 20-30 units.  She further advised that "[i]f the products work well, they likely need around additional 100."  LI also stated: "You were recommended by ENDEVCO's sales people who said you assisted them with similar situation before.  Do you have any suggestions as to how should the process proceed?"

20.    On April 3, 2007, the UC storefront responded with an e-mail to LI at qingli@optonline.net.  The e-mail included the following:

> I have enough inventory to cover your order.  I do not think that the US Government will give us a license to export these items to China.  If you want to, you can apply for a license but I do not want my companies [sic] name on that application.

-7-

OLJ-WTP-00000054

1   If you still want to proceed without the license, there are ways of doing it. But first you
2   need to provide me with more information as to where you want them delivered. The
    delivery location will greatly influence the way in which this transaction will take place.

3

4       21.    On April 4, 2007, the UC storefront received an e-mail from LI stating that she

5   thought "the location may be likely in Hong Kong." LI asked for a price quote. The UC

6   storefront responded to LI at qingli@optonline.net with an e-mail stating:

7       At the quantity of 30 we can sell at a unit cost of $2500.00 plus a calibration fee of
        $115.00 each. Our fee is 20 % because of the nature of the sale. (total price $94140.00)
8       This price will be good for delivery to you in the US. I would prefer that you take
        responsibility for getting them to Hong Kong as I am already at enough risk just selling
9       them to you. If you and your customer can agree to these terms and price please let me
        know as soon as possible.
10

11      22.    On April 4, 2007, the UC storefront received an e-mail from LI stating:

12      I don't need the products. I am just actually doing a favor for a friend in China to find
        the products. I have forwarded all the information to the friend and it's up to him for the
13      decision now. I have nothing to do with it. I have told the friend that I won't be involved
        anymore due to the risk attached. I think they will contact you directly for any further
14      questions. Sorry for any confusion to you.

15

16      23.    On April 5, 2007, the undercover agent responded to LI with an e-mail requesting

17  that LI have her friend contact him as soon as possible "as I am getting many requests." On the

18  same day, the UC storefront received an e-mail from LI, stating: "Thanks. I will let my friend

19  know. Are other requests also from China?" The undercover agent sent back to LI an e-mail

20  stating: "I think some of them are from China." On April 6, 2007, LI sent an e-mail to the UC

21  storefront stating: "I had told my friend to contact you as soon as possible. I think he will

22  contact you shortly."

23      24.    On April 9, 2007, the UC storefront received an e-mail from "china

24  man999<chinaman326@hotmail.com>" (the TARGET ACCOUNT). The email stated:

25
        I find you through my friend in USA. The type of the product that I want is ENDEVCO
        7270A-200K. I have confirmed the type of the product. I want to purchase 30 units first

-8-

and 100 or more units lately. But you [sic] price is much more than my expectation, and please forgive me kindly requesting a lower price. I expect to deliver in Hongkong. I am waiting for you reply about the new price , payment manner and delivery date.

The author identified himself/herself as "wang."

25. According to the phone call history for the UC storefront telephone line, on April 9, 2007, the UC storefront received two calls from (203) 406-9984, but the caller did not reach the undercover agent. LI had identified (203) 406-9984 as her telephone number in her initial email to the UC storefront.

26. Also on April 9, 2007, the UC storefront sent an e-mail to the TARGET ACCOUNT stating that the best the undercover agent could do was drop the unit price to $2450. The UC e-mail stated:

> Since you are willing to accept delivery in Hong Kong instead of China I will provide delivery to you. As I told Qing, the items need approval from my government to send to China and we do not have it. For this reason, I will accept payment in the form of a wire transfer for the full amount prior to export. I do not want to lose my money if they are seized by customs. I have the items here and ready to ship so delivery time will be prompt.

27. Also on April 9, 2007, the undercover agent made a consensually monitored phone call to LI at (203) 406-9984 (after the UC storefront received the two calls from that telephone number that day). I have listened to the recording of that call. During the call, LI and the undercover agent discussed LI's involvement in the transaction. Among other things, LI told the undercover agent she did not want her name associated with the e-mails between the undercover agent and her friend. LI said she went to China for Chinese New Year and while she was there she met a friend. Her friend asked if she could help him get a part. LI explained that, when she returned to the United States, she contacted ENDEVCO about the part but was told the part could not be exported. At that point, she contacted the undercover agent. LI advised that her friend does not speak English very well, so at some point she might need to contact the

-9-

1  undercover agent to help her friend.  As best as I could discern, LI spelled her friend's name as

2  FANG XUE.

3      28.     Since April 10, 2007, and up to and including July 30, 2007, the UC storefront

4  has exchanged numerous e-mail messages with WANG at the TARGET ACCOUNT.  The

5  messages have involved ongoing negotiations concerning price, payment terms and delivery.

6  For example, on April 15, 2007, the UC storefront received an e-mail from WANG stating, in

7  part:

8

9      I understand the nature of the business and the risks we are both facing, but I hope you
       can quote me a more reasonable price in order to have my client accept.

10     . . . .

11     I understand that you hope to minimize the risk by delivering the products only after you
       have received full payment in advance.  However , this is too risky for us to accept , As

12     you know, we are also taking additional risk at Hong Kong custom when we take the
       delivered products from Hong Kong to Mainland China .  As I mentioned, we are very

13     likely to have a followed order around 100 units.  I hope you understand the risk we will
       bear for the current and the next 100 unit transactions if we pay you full amount in

14     advance.  I hope we can figure out a better way for both of us , I would like to make the
       following suggestions:

15
       A,) If you have a friend or partner in Hong Kong, you can delivery [sic] the products to
16     him/her, and then we can make physical transaction in Hong Kong, We pay your
       friend/partner full payment at the same time of the delivery from your friend.

17
       B,) Escrow payment, if it is feasible.

18

19     29.     During negotiations with WANG from April 15 to April 20, 2007, all conducted

20  by e-mails to and from the TARGET ACCOUNT, the undercover agent agreed to lower the unit

21  price and also agreed to deliver personally the accelerometers to Hong Kong.  The undercover

22  agent advised WANG that the UC storefront would accept a 35 percent down payment by wire

23  transfer and would accept the remaining balance through an escrow account through a United

24  States bank of WANG's choosing.  With respect to the escrow account, the undercover agent

25  sent an e-mail to WANG on April 20, 2007, stating, in part: "I would suggest that the terms for

-10-

OLI-WTP-00000057

1  the escrow be very general as to hide the nature of our transaction." On April 26, 2007, WANG

2  replied with an e-mail from the TARGET ACCOUNT stating, in part: "What I suggested is to

3  have the down payment made through escrow from a US bank.  Since this is the first order

4  through a new supplier, I think my client would feel more comfortable this way.  We will make

5  [sic] the term as general as possible."

6       30.    On April 26, 2007, the UC storefront sent an e-mail to WANG stating, in part:

7  "The down payment must be paid via wire transfer.  If it would make you more comfortable, feel

8  free to have someone inspect the items here in the US before you send the downpayment."

9

10      31.    On April 30, 2007, the UC storefront received an e-mail from WANG from the

11  TARGET ACCOUNT explaining that WANG's client thought the UC storefront's price for the

12  accelerometers was too high, but that Wang would resume the conversation with the client after a

13  Chinese holiday.  On May 8, 2007, the UC storefront replied to WANG with an e-mail stating, in

14  part: "I think the best thing we can do now is for you to ask your client what they are willing to

15  pay and the terms in which they are comfortable."  On May 14, 2007, the UC storefront received

16  an e-mail from WANG explaining that WANG would get back to the UC agent when WANG

17  received a response from the client.

18      32.    On June 2, 2007, the UC storefront received an e-mail from WANG from the

19  TARGET ACCOUNT explaining that WANG's client would need an expert to check the

20  products, but that the expert could check the products only in mainland China.  WANG proposed

21  that the UC agent deliver the accelerometers directly to mainland China, and once the expert

22  checked the accelerometers, the UC agent would be paid while still in China.  Alternatively,

23  WANG proposed that the UC agent bring the accelerometers to Hong Kong, and then WANG

24  and the UC agent could stay together in Hong Kong while the accelerometers were sent to

25

-11-

OLI-WTP-00000058

mainland China for inspection.    On June 4, 2007, the UC agent replied to the TARGET ACCOUNT with an e-mail stating that he was thinking about just sending the accelerometers directly to China.

33.    On June 29, 2007, the UC storefront received another e-mail from WANG from the TARGET ACCOUNT advising that WANG was still waiting to hear from the client and suggesting that the negotiations take a "summer break."    That same day, the UC storefront replied with an e-mail expressing disappointment that WANG was no longer interested in the items.  The UC storefront advised WANG that it was in negotiations with another company in Asia for the same items.  The UC storefront asked whether WANG believed it was possible that the client had sourced the transaction to another company.    The UC storefront advised that, unless it heard differently from WANG, it would consider the sales negotiations closed.

34.    On July 4, 2007, the UC storefront received an e-mail from WANG from the TARGET ACCOUNT explaining that "we are seriously interested in the items" but that WANG's contact has been stuck with a big project in another city for over a month.    WANG stated: "I hope you understand that we are interested in the items and meanwhile interested in keeping long-term relationship with you, because it won't be 1 or 2 time orders and I feel you are a pleasant person."  On July 5, 2007, the UC storefront replied with an e-mail again suggesting that WANG's client might have pursued the items through a different source, as the UC storefront had received interest from other companies in Asia for the same products.  On July 16, 2007, WANG sent the UC storefront an e-mail stating that WANG would check with the client "regarding the timeline and if they are outsourcing somewhere else."  WANG inquired about the terms sought by the other interested companies.    The UC storefront replied that the other interested company was more accommodating with respect to delivery terms, but that the UC

-12-

storefront preferred not to share all the details of its other negotiations. On August 15, 2007, the UC storefront received an e-mail from WANG asking the UC to let WANG know as soon as possible how much product the UC storefront has on hand and how long it would take WANG to receive the product if shipped directly to China. WANG wrote: "Are you able to provide us the products continuously on a long-term basis?" Among other things, WANG also wrote: "If you require the down payment, the percentage probably is around 10%." I have reviewed all of the e-mail messages between Wang and the UC storefront, all of which have been sent to and from the TARGET ACCOUNT.

35.    On April 18, 2007, I sent a Customs Export Subpoena to MSN/Hotmail, requesting subscriber information for the TARGET ACCOUNT. MSN/Hotmail's response showed the TARGET ACCOUNT was registered on April 9, 2007, at approximately 1:24am, only about 10 minutes before the first e-mail from that address was sent to the UC storefront. I therefore believe that the TARGET ACCOUNT was registered for the purpose of communicating about the acquisition of the items under investigation. The person who registered the account listed his/her name as "china, man999" and listed a state and country of Beijing, China.

36.    I have obtained the Internet Protocol ("IP") history for the TARGET ACCOUNT through various means, including Customs export subpoenas, two search warrants issued from the Southern District of California and served on MSN/Hotmail on or about April 30 through July 18, 2007, and a pen register/trap-and-trace order issued from the Southern District of California on or about June 21, 2007. From the creation of the TARGET ACCOUNT on April 9, 2007, to August 17, 2007, individuals logged into the account approximately 90 times. Through publicly-available, internet-based IP research sites, I have determined that approximately 32 of

-13-

these log-ins occurred in the People's Republic of China ("PRC"). However, approximately 56 of these log-ins occurred from an IP address which, through a subpoena to CSC Holdings ("Cablevision"), I discovered was associated with an account subscribed to by LI's husband, Shaojie Zou, at 122 Forest Street, Stamford, Connecticut. I accessed Accurint (a widely-used locate-and-research tool available to government, law enforcement and commercial customers) and discovered a Qing Li with an address listed as 122 Forest Street 122, Stamford, Connecticut, and with a telephone number of (203) 406-9984 (the same number provided by LI during the communications described previously). One log-in occurred from an IP address associated with LI's neighbor at 124 Forest Street, Stamford, Connecticut. Finally, one log-in on April 18, 2007, occurred from the IP address for the Ferguson Public Library, 1 Public Library Plaza, Stamford, CT 06901. Through a subpoena to the Ferguson Public Library, and through subsequent communications with George Nichols of the legal affairs department at the Ferguson Public Library, I learned that, on April 18, 2007, someone using LI's library card (presumably LI) logged into the library's computer system.

37.    Accordingly, there is probable cause to believe that, despite LI's statement on April 5, 2007, that she has "nothing to do" with the accelerometer transaction, up to August 17, 2007, she had logged into the TARGET ACCOUNT as many as 58 times (approximately 24 times more than anyone in China has logged into the same account), including five log-ins on August 17, 2007. Furthermore, the search warrants for the contents of the TARGET ACCOUNT have not revealed any e-mail messages (apart from "spam" or advertisements) received by the TARGET ACCOUNT other than e-mail from the UC storefront. The pen register/trap-and-trace on the TARGET ACCOUNT also has not revealed any e-mails (apart from spam) being sent from, or received in, the TARGET ACCOUNT other than the communications with the UC

-14-

1    storefront. Therefore, I submit there is probable cause to believe that, through her multiple log-

2    ins to the account, LI is monitoring and aiding WANG's communications with the UC storefront.

3        38.    Based on my training and experience, and my own use of web-based e-mail

4    accounts, I am aware that multiple people sharing a password for the same web-based e-mail

5    account can use the "draft" function as a means of communication. Specifically, one member of

6    a conspiracy can log into the e-mail account and then draft and save a message without ever

7    transmitting the draft message to another e-mail address. A second conspirator can then log into

8    the same account, access the draft folder and review the message posted by the first conspirator.

9    Stated differently, the draft function can be used like a bulletin board.

10

11        39.    The search warrant executed on the TARGET ACCOUNT in July 2007 revealed

12    the presence of a draft message dated May 15, 2007, located in the account's draft folder. Jose

13    Martinez, Criminal Compliance Manager for MSN/Hotmail, informed me that the draft message

14    appeared to have been created through the use of a foreign language translation program. He

15    advised me that the use of the foreign language translation program, in conjunction with the

16    manner in which MSN/Hotmail saves and compresses draft messages, prevented him from being

17    able to provide me (in response to the search warrant) with the actual content of the draft

18    message as it appeared when it was drafted (and before it was compressed). Instead,

19    MSN/Hotmail provided an encoded version of the message. ICE Special Agent Craig Larrabee

20    ran the encoded version through a publicly-available, on-line "Corrupted Chinese E-mail Fixer."

21    The draft partially converted to Chinese characters. Department of Homeland Security

22    Language Specialist Mee Mee Chin translated the Chinese characters and advised me that the

23    draft message concerned the specifications of a battery. Considering that the UC storefront has

24    never communicated with LI or WANG concerning batteries, there is probable cause to believe

25

-15-

1  that LI and WANG are using the draft function to communicate.

2      40.    Additionally, the log-in history for the TARGET ACCOUNT reveals an

3  interesting pattern. Frequently, someone using the IP address associated with LI's residence will

4  log into the account multiple times, and then someone in the PRC will log into the account and

5  send an e-mail to the UC storefront. For example, on July 5, 2007, the UC storefront sent an

6  e-mail to WANG to the TARGET ACCOUNT. Someone using the IP address associated with

7  LI's residence then logged into the TARGET ACCOUNT on July 5, 9, 11, 13 and 15, 2007.

8  Then, on July 16, 2007, WANG used the TARGET ACCOUNT from the PRC and sent an e-

9  mail message to the UC storefront. That same day, the UC storefront replied to the e-mail.

10  Someone using the IP address associated with LI's residence then logged into the TARGET

11  ACCOUNT on July 17, 25, 26, 27, and 28, 2007. On July 29, 2007, WANG sent an e-mail to

12  the UC storefront from the TARGET ACCOUNT. This pattern also provides probable cause to

13  believe that LI and WANG are using the TARGET ACCOUNT to coordinate the

14  correspondence with the UC storefront.

15

16  **VIII. ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND**
17  **FAILED, OR APPEAR UNLIKELY TO SUCCEED IF TRIED**

18      41.    Normal investigative techniques have been used, and will continue to be used, in

19  this investigation. As explained below, however, these investigative techniques have failed, and

20  reasonably appear likely to fail, to accomplish the objectives of the investigation. Accordingly,

21  there is a compelling need for electronic surveillance of the TARGET ACCOUNT.

22      **A.    Physical Surveillance**

23      42.    The procurement activities of LI and WANG have been, and will likely continue

24  to be, conducted by e-mail communications and telephone. These communications can be

25  conducted from any location, and following LI from location to location would not be useful in

-16-

1   determining the relationship and communications between LI and WANG (who appears to reside

2   in China), or the details of their procurement operation. For example, physical surveillance is

3   useless in determining what LI is doing when she logs into the TARGET ACCOUNT. It is also

4   useless is determine how LI or WANG is using the draft function of the account. Physical

5   surveillance also will not reveal the identities of co-conspirators in the PRC or the identity of the

6   intended end-user of the accelerometers.

7

8        **B.**    <u>Use of Mail Covers</u>

9        43.    DCIS Special Agent John Helsing has informed me that DCIS used a mail cover

10  on LI's residence at 122 Forest Street, Stamford, Connecticut, from May 30, 2007, to June 28,

11  2007. Agent Helsing advised me that, within this period, LI and her husband merely received

12  account statements, bills and similar correspondence typical of most residences. I also learned

13  from Agent Helsing that only one item of mail received during the mail cover was from a foreign

14  country: a letter addressed to LI from Air China Club in Beijing, China. In short, the mail cover

15  did little to advance the investigation, other than to verify that LI received mail at the address.

16  Based on my training and experience, as well as my consultation with other agents involved in

17  this investigation, I do not believe that future mail covers will achieve the objects of the

18  investigation. Among other things, mail covers very likely will not disclose any specific

19  arrangements or communications between LI and WANG or other participants in the illegal

20  activity.

21

22       **C.**    <u>Pen Registers and Telephone Tolls</u>

23       44.    Since approximately June 27, 2007, I have received pen register and trap-and-

24  trace information for (203) 406-9984 (LI's telephone number). Since approximately June 25,

25  2007, I have also received pen register and trap-and-trace information for the TARGET

ACCOUNT, as well as qingli@optonline.net. The pen register for the TARGET ACCOUNT has

-17-

1   been very useful in providing me with updated log-in histories.   The pen register for the

2   telephone number also has been useful in revealing that someone has used the telephone to place

3   over 250 calls to the PRC.   However, this information does not identify the individuals actually

4   providing and receiving instructions through telephonic and electronic communications, nor does

5   it reveal the substance or nature of the communications.   I do not have any information revealing

6   the subscriber(s) of the telephone numbers in the PRC revealed by the pen register.   Approaching

7   the Chinese government for subscriber information, either informally or formally, would

8   jeopardize the investigation, as the Chinese government may be LI's and WANG's ultimate

9   client and end-user for the military accelerometers at issue.   Furthermore, pen register and trap-

10  and-trace information will not disclose whether LI and WANG are using the draft function of the

11  e-mail account to communicate with each other or to coordinate the e-mail messages to the UC

12  storefront.   In fact, pen register information does not reveal what is happening at all in the e-mail

13  account during a logged-in session.   In contrast, according to MSN/Hotmail Custodian of

14  Records Robert Behrens, interception of electronic communications will reveal not only whether

15  someone has prepared a draft message, but will provide the contents of the draft.

16          **D.      Use of Grand Jury Subpoenas and Interviews**

17          45.     I do not know the actual identity of WANG or where he/she lives in China.   A

18  grand jury subpoena could be served only on LI or her husband.   However, any conspirators

19  called to testify before the grand jury would most likely be uncooperative and invoke their Fifth

20  Amendment privilege.   It would be unwise to seek any kind of immunity for such persons at this

21  stage, because granting immunity might foreclose prosecution of the most culpable members of

22  the conspiracy and could not ensure that such immunized witnesses would provide truthful

23  testimony.    Additionally, service of grand jury subpoenas on conspirators, or their close

24  associates, would only alert them to the existence of this investigation, causing them to be more

25  secretive, to destroy evidence, or to flee, and would otherwise compromise the investigation.   LI

-18-

1  is a citizen of the PRC and has recently traveled there. I believe that if LI is alerted to this

2  investigation, either through an interview or a grand jury subpoena, there is a substantial risk that

3  she would flee the United States.

4      46.    Some grand jury subpoenas for documents have been issued to financial

5  institutions at which LI or her husband has accounts. Although the records show funds being

6  wire transferred to, and from, China, it is not possible to determine through such records alone

7  whether the transfers have anything to do with WANG or any illegal procurement activities.

8  Moreover, because the accelerometers sought by LI and WANG have many military end-uses,

9  the Chinese government may well be LI's and WANG's ultimate client and end-user, making it

10  impractical to request from the PRC information concerning the ownership of the Chinese

11  accounts sending and receiving funds to and from LI, as such a request would prematurely

12  disclose the existence of this investigation.

13      47.    Based upon my experience, I also believe that attempting interviews of the

14  TARGET SUBJECTS, or their known associates, at this time would most likely result in

15  responses containing a significant number of untruths, would cause these individuals to be more

16  secretive, to destroy evidence, or to flee, and would otherwise compromise the investigation.

17  Accordingly, I believe that interviews and grand jury subpoenas are, and will be, inadequate to

18  achieve all the objectives of this investigation.

19      **E.    Use of Search Warrants**

20      48.    As mentioned, search warrants have been useful in obtaining content stored in the

21  TARGET ACCOUNT. However, MSN/Hotmail Custodian of Records Robert Behrens advised

22  me that Hotmail's default settings are such that once a draft message is actually sent as an e-mail,

23  the sent message is not saved to the Hotmail server, and that if an individual deletes a draft

24  message, the message is not saved to the Hotmail server. Therefore, other than the requested

25  interception order, the only way to obtain all draft messages would be to send preservation letters

-19-

1    to Hotmail on a daily and continuous basis, followed by the constant execution of search

2    warrants, which would be tantamount to an interception order in any event.    Furthermore, as

3    described in paragraph 39, search warrants executed on MSN/Hotmail will not provide me with

4    the actual content of draft messages saved in the TARGET ACCOUNT. Jose Martinez, Criminal

5    Compliance Manager for MSN/Hotmail, has advised me that it is his belief that, in response to

6    an order authorizing the interception of electronic communications, MSN/Hotmail would be able

7    to provide me with the content of the draft messages before they are compressed.

8        49.    Furthermore, based on my training and experience, I believe that executing a

9    search warrant on LI's residence at this time would not result in the achievement of all the

10    objects of this investigation for many of the same reasons that grand jury subpoenas and

11    interviews would fail to do so.   The execution of the search warrant would alert LI and her

12    coconspirators to the existence of this investigation, causing them to be more secretive, to

13    destroy evidence, or to flee, and would otherwise compromise the investigation.

14    **F.    Confidential Sources**

15        50.    I have considered the potential use of confidential sources in this investigation.

16    However, neither ICE nor DCIS has any confidential source with direct access to LI or WANG,

17    and I do not know of any way to develop successfully such a source without posing a serious risk

18    of disclosing the investigation to LI or WANG.   As previously described, although the UC

19    storefront was able to make initial, direct contact with LI, she quickly directed the UC storefront

20    to WANG, stating that she did not want her name on any of the communications between

21    WANG and the UC storefront.   Accordingly, I do not believe that a confidential source could

22    establish direct communication with LI concerning the matter under investigation without risking

23    the investigation.

24

25

-20-

QLI-WTP-00000067

**G.    Arrests**

51.    Attempting to arrest LI now would mean that several of the objectives of this investigation would be unfulfilled. Coconspirators in China have yet to be fully identified. The ultimate end-user of the accelerometers has yet to be identified. If we arrested LI, WANG and his/her client in China would almost certainly cease their illegal activities or change the instrumentalities and methods used to conduct their illegal activities. Moreover, although there is now probable cause to believe that LI is engaged in illegal procurement activities, the likelihood of convicting LI would be increased by evidence obtained from the requested surveillance.

52.    Based upon the foregoing, it is my belief that the interception of wire and electronic communications is an essential investigative means in obtaining evidence of the offenses in which the TARGET SUBJECTS and others as yet unknown are involved.

**IX.    MINIMIZATION**

53.    All intercepted communications over the TARGET ACCOUNT will be minimized in accordance with Chapter 119 of Title 18, United States Code.

54.    The "investigative or law enforcement officers of the United States" who are to carry out the requested interception of e-mails will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges.

55.    It is requested that the order provide, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted e-mails are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

56.    Electronic communications will be minimized after the fact and as soon as practical after such interception pursuant to Title 18, United States Code, Section 2518(5). The electronic communications will be reviewed and minimized as follows: all electronic

-21-

communications sent to or through the TARGET ACCOUNT will be intercepted in their entirety and electronically stored on magnetic media. Printed copies of all communications will also be made where feasible. Working copies of all of the electronic communications will then be made from the magnetic media.

57.     Because of the type of information intercepted, the monitoring agents will not be able to contemporaneously minimize any non-pertinent information. The monitoring agents will not be able to minimize the electronic communications until after the communications have been received at the monitoring location. As soon as practicable thereafter, these electronic communications will be reviewed and minimized. It is anticipated that the monitoring location will not be staffed at all times, but will be activated electronically. The monitoring location will be kept secure and access will be available only to persons authorized to be involved with this investigation. Monitoring agents will review the working copies, and based on the identities of the parties to the electronic communication and the subject matter and content of the electronic communication, will determine whether the communication appears to be pertinent to the criminal offenses listed in the Court's order or pertinent to other criminal activity. As soon as an electronic communication is determined to be non-pertinent, review of the electronic communication will cease and the communication will be designated as non-pertinent.

58.     Because the interception, recording and minimization of electronic communications within a computer network require the use of new programs and techniques, it may become necessary to modify the techniques described herein. The Court will be notified before any material change is implemented.

59.     Unless extended by the Court, all interceptions conducted pursuant to this Court's order will terminate upon full attainment of the authorized objectives or, in any event, at the end

-22-

of thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under the Court's order or ten (10) days after the order is entered.

60.    Under the provisions of Title 18, United States Code, Section 2518(4), the Court may, upon request of the applicant, direct that a service provider furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as that provider is according the persons whose communications are to be intercepted. The assistance of the service provider, MSN/Hotmail, is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by ICE.

61.    As this affidavit reveals an ongoing investigation and the use of an undercover storefront, I request that it be sealed until further order of the Court to avoid premature disclosure of the investigation and to guard against fugitives.

Michael B. Cochran, Special Agent
U.S. Immigration & Customs Enforcement

SWORN and SUBSCRIBED to before me
on the 2 7 day of _August_, 2007.

UNITED STATES DISTRICT JUDGE
Southern District of California

-23-

OLI-WTP-00000070

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **Criminal Case No. 07 Cr 2915 JM** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| QING LI, | ) | **AFFIDAVIT OF SERVICE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

State of New York:
County of New York: ss:

Yin Lan, being duly sworn deposes and says, that deponent is not a party to this action, is over 18 years of age and resides in Brooklyn, New York.

That on the 14th day of January, 2008, deponent served the within Notice of Motion, by depositing a true and complete copy of same, under the exclusion care and custody of Federal Express for Overnight Delivery, within the State of New York, for delivery properly addressed as follows:

AUSA William Cole
United State Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101

Yin Lan

Sworn to before me this
January 14, 2008

Notary Public

INGRID E. LEON
Notary Public, State of New York
No. 01-LE6008577
Qualified in New York County
Commission Expires June 15, 20___