KAREN P. HEWITT
United States Attorney
WILLIAM P. COLE
Assistant U.S. Attorney
California State Bar No. 186772
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7859/(619) 557-7055 (Fax)
Email: William.P.Cole@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE JEFFREY T. MILLER)

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> QING LI, <br><br> Defendant. | Criminal Case No. 07-CR-2915-JM <br><br> GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS: <br><br> 1) TO DISMISS THE INDICTMENT; <br> 2) TO SUPPRESS EVIDENCE; <br> 3) TO COMPEL DISCOVERY; AND <br> 4) FOR LEAVE TO FILE FURTHER MOTIONS <br><br> Date: February 29, 2008 <br> Time: 1:30 p.m. |

COMES NOW Plaintiff United States of America, by and through its counsel, Karen P. Hewitt, United States Attorney, and William P. Cole, Assistant U.S. Attorney, and files it Response in Opposition to Defendant Qing Li's above-referenced motions.

/ /

/ /

/ /

/ /

/ /

# I
# STATEMENT OF FACTS

### A. The Indictment

On October 18, 2007, a federal grand jury returned an Indictment charging defendant with conspiracy to export defense articles without a license, in violation of 22 U.S.C. § 2778(b)(2), and to smuggle goods from the United States, in violation of 18 U.S.C. § 554, all in violation of 18 U.S.C. § 371.

### B. The Arms Export Control Act

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, regulates the brokering and export of defense articles and services from the United States. Among other things, the AECA authorizes the President of the United States to: (1) designate defense articles and defense services on the United States Munitions List (the "Munitions List"); (2) require licenses or other approvals for the brokering or export of defense articles on the Munitions List; and (3) promulgate regulations to implement the AECA.[1] The regulations are known as the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Sections 120-130. The United States Department of State, Directorate of Defense Trade Controls, administers the ITAR and regulates the export of defense articles.

Generally, if someone wants to export a defense article from the United States, he or she must first seek an export license from the Directorate of Defense Trade Controls. 22 CFR 123.1(a). The Directorate of Defense Trade Controls evaluates license applications to determine whether the proposed export would further the foreign policy and national security interests of the United States. It is the policy of the United States to deny licenses and other approvals for exports of defense articles destined for China. 22 CFR 126.1.

---

[1] The State Department's inclusion of commodities on the Munitions List is not subject to judicial review. 22 U.S.C. § 2778(h); United States v. Martinez, 904 F.2d 601, 602-03 (11th Cir. 1990) (designation of items on Munitions List is a political question not subject to judicial review).

If someone is unsure whether a particular commodity is covered by the Munitions List, that person may seek a commodity jurisdiction determination from the Directorate of Defense Trade Controls. 22 CFR 120.4.

### C.     The Endevco 7270A-200K Accelerometer

Endevco Corporation is located in San Juan Capistrano, California. Endevco manufactures the 7270A-200K piezoresistive accelerometer, which is capable of measuring shocks up to and beyond 200,000 $g$-force. [Complaint, p.2][2/] Applications for these accelerometers include, among other things, the development of missiles, large guns, artillery, and the measurement of ground motions produced by nuclear and chemical explosions. [Id.] The Directorate of Defense Trade Controls has certified that the 7270A-200K accelerometer is a defense article on the United States Munitions List, Category XII(d). [Id.] Category XII(d) covers "[i]nertial platforms and sensors for weapons or weapon systems; guidance, control and stabilization systems . . . ; astrocompasses and star trackers and military accelerometers and gyros." 22 CFR 121.1, Category XII(d).

### D.     Li Conspires with "Wang" to Obtain the Illegal Exportation of the 7270A-200K Accelerometer to China

In March 2007, Li contacted an Endevco sales representative about acquiring the 7270A-200K accelerometer for a client in China. The sales representative immediately sent Li an e-mail stating that the product "is export controlled by the U.S. government and cannot be exported."

On April 2, 2007, a United States Immigration and Customs Enforcement undercover storefront (the "UC company") received an e-mail from LI. The e-mail stated: "Hello, I am looking for sensor for my client in China. The model is: ENDEVCO 7270A-200K. The scale is 20G. Do you have this product and could you provide me with picture?"

On April 2, 2007, the UC company responded with an e-mail to LI stating that the UC company had a number of 7270A-200K accelerometers available. The e-mail stated, in part: "How

---

[2/]     A force of 200,000 $g$ is remarkably massive. For example, military pilots with pressure suits may experience up to 9 $g$'s.

many of these items do you require? As you know, these items are export controlled so you will need to keep this in mind if you are serious about proceeding with this purchase."

On April 2, 2007, LI advised the UC company that the first order would be for around 20-30 units. She further advised that "[i]f the products work well, they likely need around additional 100." LI also stated: "You were recommended by ENDEVCO's sales people who said you assisted them with similar situation before. Do you have any suggestions as to how should the process proceed?"

On April 3, 2007, the UC company sent LI an e-mail stating, in part:

> I have enough inventory to cover your order. I do not think that the US Government will give us a license to export these items to China. If you want to, you can apply for a license but I do not want my companies [sic] name on that application.
>
> If you still want to proceed without the license, there are ways of doing it. But first you need to provide me with more information as to where you want them delivered. The delivery location will greatly influence the way in which this transaction will take place.

On April 4, 2007, Li asked for a price quote and stating that she thought "the location may be likely in Hong Kong." The UC company responded:

> At the quantity of 30 we can sell at a unit cost of $2500.00 plus a calibration fee of $115.00 each. Our fee is 20 % because of the nature of the sale. (total price $94140.00) This price will be good for delivery to you in the US. I would prefer that you take responsibility for getting them to Hong Kong as I am already at enough risk just selling them to you. If you and your customer can agree to these terms and price please let me know as soon as possible.

On April 4, 2007, the UC company received an e-mail from LI, stating:

> I don't need the products. I am just actually doing a favor for a friend in China to find the products. I have forwarded all the information to the friend and it's up to them for the decision now. I have nothing to do with it. I have told the friend that I won't be involved anymore due to the risk attached. I think they will contact you directly for any further questions. Sorry for any confusion to you.

On April 9, 2007, the UC company received an e-mail from chinaman326@hotmail.com (the "chinaman326 account"). The author identified himself as "Wang." The email stated:

> I find you through my friend in USA. The type of the product that I want is ENDEVCO 7270A-200K. I have confirmed the type of the product. I want to purchase 30 units first and 100 or more units lately. But you [sic] price is much

> more than my expectation, and please forgive me kindly requesting a lower price. I expect to deliver in Hongkong. I am waiting for you reply about the new price , payment manner and delivery date.

ICE subpoenaed the subscriber information for the chinaman326 account from MSN/Hotmail. The account was registered on April 9, 2007, about ten minutes before the first e-mail from the chinaman326 account was sent to the UC company. The person who registered the account listed his name as "china, man999" and identified his location as Beijing, China.

On April 9, 2007, the UC company sent an e-mail to the chinaman326 account, stating, in part:

> As I told Qing, the items need approval from my government to send to China and we do not have it. For this reason, I will accept payment in the form of a wire transfer for the full amount prior to export. I do not want to lose my money if they are seized by customs. I have the items here and ready to ship so delivery time will be prompt.

Also on April 9, 2007, the UC company received two telephone calls from LI's telephone number, but the UC agent did not answer. The UC agent then made a consensually monitored phone call to LI. During the call, LI stated she had spoken to her friend the day before and that he would send an e-mail to the UC company. LI told the UC agent "don't put my name on the e-mail" between the UC agent and her friend. LI also said that she told her friend not to put her name on his e-mail to the UC company. LI explained to the UC agent that, although the e-mail would not include LI's name, the UC agent could know that it was from her friend because she told her friend "to list the product's name, the price, and the location. You should figure it's from him."

From April 10, 2007, to October 10, 2007, the UC company exchanged approximately thirty-seven e-mails with "Wang." All the messages were sent to, or received from, the chinaman326 account, and a Chinese IP address was used by Wang each time a message was sent to the UC company. The messages involved negotiations concerning price, payment terms and delivery of the accelerometers to the PRC. Frequently, the e-mail messages discussed the illegality of the transaction and the delivery options.

For example:

- On April 15, 2007, the UC company received an e-mail from Wang stating, in part: "I understand the nature of the business and the risks we are both facing, but I hope you can quote me a more reasonable price in order to have my client accept." Wang also stated: "As you know, we are also taking additional risk at Hong Kong custom when we take the delivered products from Hong Kong to Mainland China."

- On April 20, 2007, the UC company sent Wang a message stating, in part: "I would suggest that the terms for the escrow be very general as to hide the nature of our transaction." On April 26, 2007, Wang replied with an e-mail stating, in part: "What I suggested is to have the down payment made through escrow from a US bank. Since this is the first order through a new supplier, I think my client would feel more comfortable this way. We will makc [sic] the term as general as possible."

- On June 2, 2007, the UC company received an e-mail from Wang explaining that his client would need an expert to check the products, but that the expert could check the products only in mainland China. Wang proposed that the UC agent deliver the accelerometers directly to mainland China, and once the expert checked the accelerometers, the UC agent would be paid while still in China. Alternatively, Wang proposed that the UC agent bring the accelerometers to Hong Kong, and then Wang and the UC agent could stay together in Hong Kong while the accelerometers were sent to mainland China for inspection.

- On August 17, 2007, the UC company sent an e-mail to Wang including the following statement: "Please understand the risk I am taking by shipping these products to China without an export license. If I get caught, I am at risk of losing my business and going to jail. We both need to proceed cautiously to protect both of ourselves."

- On August 21, 2007, Wang replied with an e-mail stating, "Thanks for reminding

me the risk. I will proceed carefully." Wang then asked once again if the UC agent could deliver the accelerometers to China for inspection, with payment to follow by wire transfer or letter of credit.

ICE obtained the Internet Protocol ("IP") history for the chinaman326 account. From the creation of the chinaman326 account on April 9, 2007, to October 10, 2007, individuals logged into the account approximately 126 times. Approximately 37 of these log-ins occurred in the PRC. However, approximately 87 of these log-ins occurred from the IP address associated with Li's residence in Connecticut (hereafter, "LI's IP address"). Furthermore, the log-in history followed an interesting pattern. Typically, after the UC company sent an e-mail to Wang at the chinaman326 account, the first accessing of the chinaman326 account would be from LI's IP address, not a Chinese IP address. Then, as verified by pen register analysis, telephone calls would be placed from LI's residence to a number in China. Shortly thereafter, someone would log into the chinaman326 account in China and send a responsive e-mail to the UC company.

In short, it appeared that Li was not only continually monitoring Wang's negotiations with the UC agent, but was actually helping Wang prepare the e-mails sent to the UC agent. Materials subsequently seized from Li's residence confirmed this suspicion: the agents found that Li had in fact drafted the vast majority of Wang's e-mail messages to the UC agent.

## II

### THE ARMS EXPORT CONTROL ACT IS NOT VOID FOR VAGUENESS

Li moves to dismiss the Indictment on the ground that the AECA is "unconstitutionally vague." She contends that no ordinary person could possibly determine whether the Endevco 7270A-200K accelerometer is covered by the Munitions List. Her contention lacks any merit.

Outside the First Amendment context, vague laws have two principal evils: "(1) they do not give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly'; and (2) they encourage arbitrary and discriminatory enforcement by not providing explicit standards for policemen, judges, and juries." United States v. Kim, 449 F.3d 933, 941-42 (9th Cir. 2006) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)).

Vagueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant. Id. at 942.

"The degree of vagueness that the Constitution tolerates--as well as the relative importance of fair notice and fair enforcement--depends in part on the nature of the enactment." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982). Economic regulation is "subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." Id.; accord United States v. Lee, 183 F.3d 1029, 1032 (9th Cir. 1999). Additionally, "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." Hoffman Estates, 455 U.S. at 498. Finally, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." Id. at 499; accord Lee, 183 F.3d at 1033 ("inclusion of a scienter requirement significantly reduces any concern that the statute and regulation fail to provide proper notice").

Applying these standards, the courts have repeatedly rejected vagueness challenges to the AECA. See Lee, 183 F.3d at 1032-33 (rejecting vagueness challenge to the AECA and it implementing regulations); United States v. Hsu, 364 F.3d 192, 196-97 (4th Cir. 2004) (same); United States v. Sun, 278 F.3d 302, 309-10 (4th Cir. 2002) (same); United States v. Gregg, 829 F.2d 1430, 1437 (8th Cir. 1987) (same); United States v. Swarovski, 592 F.2d 131 (2d Cir. 1979) (rejecting vagueness challenge to the AECA's predecessor statute). The reasons are straightforward.

First, the AECA regulates a narrow economic activity: the exportation of military items. Thus, a less strict vagueness test applies. Lee, 183 F.3d at 1032.

Second, any individual who is unsure whether a particular commodity is covered by the Munitions List can simply ask the Directorate of Defense Trade Controls. 22 CFR 120.4. This ability to "contact the appropriate government agency to resolve any perceived ambiguity" mitigates any purported vagueness. Lee, 183 F.3d at 1032.

Third, and perhaps most importantly, the AECA has a solid scienter requirement: a defendant can only be held criminally responsible for "willfully" exporting defense articles without a license. 22 U.S.C. § 2778(b)(2); Lee, 183 F.3d at 1032-33. To establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that her conduct was unlawful. Bryan v. United States, 524 U.S. 184, 191-192 (1998). In Lee, the Ninth Circuit held that the AECA's scienter requirement "protects the innocent exporter who might accidentally and unknowingly export a proscribed component or part whose military use might not be apparent through physical appearance." 183 F.3d at 1032-33. The Fourth Circuit put it this way: "requiring the jury to find a defendant acted 'willfully' necessarily leaves 'innocent' exporters outside the statute's scope and so vitiates any vagueness concerns." Hsu, 364 F.3d at 197 n.1.

Indeed, a vagueness challenge "comes with little grace from one who was fully cognizant of the wrongfulness of his acts." Swarovski, 592 F.2d at 132. Here, the evidence will show that Li knew full well that it was illegal to export the 7270A-200K accelerometer to China. When Li first sought to acquire the accelerometers from Endevco, the sales representative immediately advised her in writing that the item "is export controlled by the U.S. government and cannot be exported." Then, when Li sought the accelerometers from the undercover agent, he immediately told her that "these items are export controlled." The next day, the undercover agent sent Li an e-mail stating: "I do not think the US Government will give us a license to export these items to China. If you want to, you can apply for a license but I do not want my companies [sic] name on that application." Later, Li monitored the e-mail communications between Wang and the UC agent, and she drafted many of Wang's e-mails to the UC agent. As previously described, those e-mails were rife with discussions of the illegality.

Considering these facts, Li's vagueness challenge indeed "comes with little grace." Swarovski, 592 F.2d at 132. In Hsu, an undercover agent similarly informed the defendants that exporting particular encryption technology to China would be illegal. In rejecting the defendants' vagueness challenge to the AECA, the Fourth Circuit observed:

[T]he question of whether the AECA or its regulations suffice to provide a

> hypothetical defendant fair notice as to what encryption devices qualify as "military," and so require an export license, is not before us. Rather, we need only determine whether the statute and regulations were vague as applied to these particular defendants--i.e., whether Hsu and Yang in fact had fair notice that the statute and regulations proscribed their conduct. We have no difficulty concluding that they did.

Hsu, 364 F.3d at 196 (emphasis in original).

So it is here. The AECA regulates only economic activity, provides for guidance from the regulating agency, incorporates a scienter requirement, and has repeatedly withstood vagueness challenges. What's more, Li had actual notice that the 7270A-200K accelerometer could not be lawfully exported to China. For all these reasons, her vagueness challenge fails and the Court should deny her motion to dismiss the Indictment.

### III

### THE COURT SHOULD NOT SUPPRESS ANY INTERNET PROTOCOL INFORMATION OBTAINED BY ADMINISTRATIVE SUBPOENA

Li contends that Immigration and Customs Enforcement agents used invalid subpoenas to obtain Internet Protocol (IP) information concerning the MSN/Hotmail account used by Li and Wang to communicate with the undercover agent. Therefore, she contends that ICE obtained the IP information in violation of the Stored Communications Act (18 U.S.C. §§ 2702-2712). She moves for wholesale suppression of the IP information.

As explained below, the Court should deny her motion. First, regardless of whether the subpoenas were valid, suppression is not available. Second, the subpoenas were valid.

**A.    Relevant Facts**

ICE issued a Customs Export Enforcement subpoena to MSN/Hotmail to learn the subscriber for the chinaman326 account. Via subpoena, MSN/Hotmail also provided log-in histories for the chinaman326 account--i.e., the date and time of the log-ins, along with the IP address used for each log-in.

ICE used publicly-available IP tracing websites to ascertain that numerous log-ins occurred through an IP address assigned to Cablevision (an Internet Service Provider) and that one log-in

occurred through an IP address assigned to the Ferguson public library in Stamford, Connecticut. A subpoena to Cablevision revealed that the IP address was associated with an account subscribed to by Li's husband. A subpoena to the Ferguson Public Library revealed that someone using Li's library card had accessed the library's computer system on the same day that system was used to access the chinaman326 account. In short, the subpoenaed information indicated that Li was repeatedly accessing the chinaman326 account used by Wang to communicate with the undercover agent concerning the illegal export transaction. In June 2007, the Government obtained an order authorizing a pen register on the chinaman326 account. The pen register revealed that Li was accessing the chinaman326 account far more often than anyone in China.

### B.  Subpoenas Or Not, Suppression is Unavailable

Regardless of whether ICE had authority to issue the Customs Export Enforcement Subpoenas, Li's suppression motion has no merit. This is true for several reasons.

First, the Stored Communications Act does not provide an exclusion remedy. United States v. Smith, 155 F.3d 1051, 1056 (9th Cir. 1998). "It allows for civil damages, see 18 U.S.C. § 2707, and criminal punishment, see 18 U.S.C. § 2701(b), but nothing more." Id.; United States v. Ferguson, 508 F. Supp. 2d 7, 10 (D.D.C. 2007) ("Even if Defendant was correct that the Government did not comply with the SCA, the statute does not provide for a suppression remedy."); 18 U.S.C. § 2708. Thus, even assuming the entire premise of Li's motion–that ICE violated the Stored Communications Act–suppression still would not follow.

Second, the subpoenaed information did not include the contents of any e-mail communications. Rather, the information included IP log-in histories and IP address/subscriber information. "[E]-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information." United States v. Forrester, ___ F.3d ___, 2008 U.S. App. LEXIS 202, at *19 (9th Cir. Jan. 7, 2008). In short, IP addressing information is akin to the telephone numbers captured by a pen register or to surveillance of physical mail. Id. at *18-22.

Thus, the Fourth Amendment is not even implicated. See id. at *21 ("the Court in Smith and Katz drew a clear line between unprotected addressing information and protected content information").

Third, the Fourth Amendment also is irrelevant because the subpoenaed information was obtained not from Li, but from a third party not before the Court. In other words, Li lacks standing. A court's "supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." United States v. Payner, 447 U.S. 727, 735 (1980). The Supreme Court "has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." United States v. Miller, 425 U.S. 435, 443 (1976); United States v. Hamilton, 434 F. Supp. 2d 974, 978 (D.D.C. 2006) ("it is well-settled that a person does not have a constitutionally protected reasonable expectation of privacy in information conveyed or disclosed to a third party"). Thus, "this case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued." Id. at 444.

For these reasons, regardless of whether ICE had authority to issue the subpoenas, the Court should deny Li's suppression motion.

**C.     The Customs Subpoenas Were Valid**

ICE had authority to issue the administrative subpoenas.

The Export Administration Act of 1979 ("EAA") provides that any department or agency exercising any function thereunder "may by subpena require any person to appear and testify or to appear and produce books, records, and other writings" as necessary or appropriate to the enforcement of the EAA. 50 U.S.C. App. § 2411(a)(1). The AECA provides that the President is authorized to exercise the same powers concerning enforcement of the AECA which are conferred upon departments and agencies by the EAA, including the specific provisions of the

EAA providing subpoena power. 22 U.S.C. § 2778(e). Accordingly, the AECA granted the President authority to issue subpoenas to investigate violations of, and to enforce, the AECA.

The President delegated the authorities conferred by § 2778 to the Secretary of State. [Executive Order 11958, as amended.] In turn, the Secretary of State delegated investigation and enforcement authority to ICE. 22 CFR 127.4 (granting ICE authority to "take appropriate action to ensure observance of [the International Traffic in Arms Regulations] as to the export or attempted export of any defense article" and "to investigate . . . any export or attempted export of defense articles . . . contrary to [the International Traffic in Arms Regulations]"); see also United States v. Boumelhem, 339 F.3d 414, 424 n.9 (6th Cir. 2003) ("Customs enforces a number of laws for other arms of the Executive Branch, including laws that deal with the 'importations and exportations of arms, ammunition, . . . and other munitions of war [that] are . . . administered by the . . . Department of State,' 19 CFR § 161.2, such as the Arms Export Control Act, see 22 CFR § 127.4."). Furthermore, Customs officers may execute and serve any subpoena issued under the authority of the United States. 19 U.S.C. § 1589a.

Accordingly, ICE has ample authority to issue the administrative subpoenas authorized by 22 U.S.C. § 2778(e). Issuing a subpoena is, of course, an "appropriate action" to take in enforcing the AECA, and it is an appropriate step "to investigate" suspected violations of the AECA. Thus, ICE had authority to issue the subpoenas in exercising its enforcement authority for the State Department. See 19 CFR 161.2; 22 U.S.C. § 2778(e) (President may exercise the same powers "under the same terms and conditions" as set forth in 50 U.S.C. App. § 2411(a)); 50 U.S.C. App. § 2411(a)(1) ("any department or agency exercising any function thereunder" may use subpoenas to compel production).

For these additional reasons, the Court should deny Li's motion to suppress the subpoenaed information.

**IV**

**THE COURT SHOULD DENY LI'S MOTION TO SUPPRESS ALL EVIDENCE OBTAINED BY SEARCH WARRANTS AND INTERCEPTIONS**

Li moves for suppression of all evidence obtained by pen register, search warrants or "electronic interception" as "fruit of the poisonous tree." She contends that all pen register orders, search warrants and interception orders obtained in this case were predicated on the IP information obtained by the allegedly invalid subpoenas.

As already explained, Li has no standing to seek–and no ability to obtain–suppression of any of the evidence obtained from third parties. Thus, the tree isn't poisonous.[3/] The Court should deny Li's motion to suppress.

**V**

**LI'S DISCOVERY MOTION**

The Government has produced approximately 1200 pages and roughly 170 audio files in discovery. The Government will continue to provide discovery, as needed.

**A.     The Government Will Disclose Information Subject to Disclosure Under Rule 16(a)(1)(A) and (B) of the Federal Rules of Criminal Procedure**

The Government will disclose statements of the defendant as provided by Rule 16(a)(1)(A) and (B). The defendant is not entitled to summaries of oral statements of the defendant made to persons not known by him to be government agents, and the memorialization of any such statements in a written report does not make them discoverable as "written" statements of the defendant. United States v. Hoffman, 794 F.2d 1429, 1432 n.4 (9th Cir.1986).

Agent rough notes, to the exist they exist, will not be produced as part of Rule 16 discovery. A defendant is not entitled to rough notes because they are not "statements" within

---

[3/]     Additionally, the pen register information is not suppressible, even if obtained in violation of the pen-register statute. Forrester, 2008 U.S. App. LEXIS 202, at *26-28 (suppression is not a remedy under the pen-register statute).

the meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness's assertions and they have been approved or adopted by the witness. See United States v. Bobadilla-Lopez, 954 F.2d 519, 522-23 (9th Cir. 1992) (holding that border patrol agent's recorded radio transmissions were not Jencks Act statements, stating that they "share the same rough, incomplete nature as notes hurriedly jotted during surveillance"); United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980) (rough, incomplete notes not Jencks Act statements); see also United States v. Alvarez, 86 F.3d 901, 906 (9th Cir. 1996) (transcribed copies of investigator's dictated surveillance notes not subject to disclosure under Jencks Act); United States v. Boshell, 952 F.2d 1101, 1105 (9th Cir. 1991).

### B.  The Government Will Comply With Rule 16(a)(1)(D)

The Government is not aware of any prior criminal record for defendant. However, if the Government becomes aware of such record, it will provide discovery of the record to defense counsel.

### C.  The Government Will Comply With Rule 16(a)(1)(E)

The Government will permit the defendant to inspect and copy or photograph all books, papers, documents, photographs, tangible objects, buildings, or places, or portions thereof, which are within the possession, custody, or control of the Government, and which are material to the preparation of the defendant's defense or are intended for use by the Government as evidence-in-chief at trial or were obtained from or belong to the defendant.

The defendant is not entitled to all evidence known or believed to exist which is, or may be, favorable to the accused, or which pertains to the credibility of the Government's case. As stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980):

> [T]he prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality.

Id. at 774-775 (citations omitted); see also United States v. Sukumolachan, 610 F.2d 685, 687 (9th Cir. 1980) (the Government not required to create exculpatory material that does not

exist); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976) (Brady does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure).

### D. The Government Will Comply With Rule 16(a)(1)(F)

The Government is not presently aware of any physical or mental examinations, or scientific tests or experiments, referenced in Rule 16(a)(1)(F). However, if this changes, the Government will permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession of the Government, and by the exercise of due diligence may become known to the attorney for the Government and are material to the preparation of the defense or are intended for use by the Government as evidence-in-chief at the trial.

### E. The Defendant is Not Entitled to the Disclosure of Witness Statements Prior to the Witness Testifying on Direct Examination at Trial

Production of witness statements is governed by the Jencks Act, 18 U.S.C. § 3500, and need occur only upon timely motion after the witness testifies on direct examination. See United States v. Taylor, 802 F.2d 1108, 1118 (9th Cir. 1986); United States v. Mills, 641 F.2d 785, 790 (9th Cir. 1981). Even material believed to be exculpatory and therefore subject to disclosure under the Brady doctrine, if contained in a witness statement subject to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under the Act. See United States v. Bernard, 623 F.2d 551, 556 (9th Cir. 1979).

### F. Expert Witnesses

Well in advance of trial, the Government will give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief.

### G. Brady and Henthorn Material

The Government will perform its duty under Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory evidence within its

possession that is material to the issue of guilt or punishment, as well as its duty under <u>Giglio v. United States</u>, 405 U.S. 150 (1972), to provide information on any benefits provided to Government witnesses in exchange for their testimony. Additionally, the Government will examine the personnel records of any Government personnel who will testify at trial, and provide such material as the defense may be entitled to receive under <u>United States v. Henthorn</u>, 931 F. 2d 29 (9th Cir. 1991).

### H.    Witness Lists and Addresses

There is no requirement in a non-capital case for the Government to supply the defense with a list of witnesses it expects to call at trial. The Government objects to providing any such list at this time, and also objects to any request for the names and addresses of witnesses that the Government may or may not call at trial. Criminal convictions of witnesses, known to the Government, will be disclosed prior to the witnesses' testimony.

To the extent the defendant's discovery requests exceed the scope of Rule 16 and <u>Brady</u>, as set forth above, the Government objects to the requests.

## VI

## LI'S MOTION FOR LEAVE TO FILE FURTHER MOTIONS

The Government opposes the defendant filing further motions unless they are based on new discovery or other information not available to the defendant at the time of the motion hearing in this matter.

/ /
/ /
/ /
/ /
/ /
/ /

# VII

# CONCLUSION

For the foregoing reasons, the Government requests that the defendant's motions be denied, except where unopposed.

DATED: February 15, 2008

                    Respectfully submitted,

                    KAREN P. HEWITT
                    United States Attorney

                    s/William P. Cole

                    _____
                    WILLIAM P. COLE
                    Assistant United States Attorney

                    Attorneys for Plaintiff
                    United States of America
                    Email: William.P.Cole@usdoj.gov

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 07-CR-2915-JM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CERTIFICATE OF SERVICE |
| QING LI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

IT IS HEREBY CERTIFIED THAT:

I, WILLIAM P. COLE , am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I am effecting service of **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT, TO SUPPRESS EVIDENCE, TO COMPEL DISCOVERY AND FOR LEAVE TO FILE FURTHER MOTIONS** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. Gerard Jeffrey Wasson
2. Stacey Van Malden

I hereby certify that I am causing the mailing of the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

1. Paul A. Goldberger
   Goldberger & Dubin, P.C.
   401 Broadway, Suite 306
   New York, NY 10013

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2008.

                                                    s/William P. Cole
                                                  WILLIAM P. COLE